# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Android Tablet (black), IMEI: 016095009370331<br>Seized as FP&F No. 2022565800003201 Item 002<br>("Target Device 2") | Case No. '22 MJ3743 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324(a)(1)(A)(ii) & (v)(i) | Conspiracy to Transport Certain Aliens |

The application is based on these facts:
See Attached Affidavit of Alexander R. Djokich, U.S. Border Patrol Agent, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Alexander R. Djokich, Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: ___10/13/2022___

*Judge's signature*

City and state: San Diego, California          Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, U.S. Border Patrol Agent Alexander Djokich, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of applications for warrants to search the following electronic devices:

> Apple iPhone (gray)
> Seized as FP&F No. 2022565800003201 Item 001
> ("Target Device 1")
>
> Android Tablet (black), IMEI: 016095009370331
> Seized as FP&F No. 2022565800003201 Item 002
> ("Target Device 2")
>
> Android Tablet (black), IMEI: 016095009369556
> Seized as FP&F No. 2022565800003201 Item 003
> ("Target Device 3")

(collectively, "**Target Devices**") as further described in Attachments A-1, A-2, and A-3, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) (conspiracy to transport certain aliens), as further described in Attachment B.

2. The requested warrant relates to the investigation of Sebastian MEDINA for transportation of non-citizens who lack legal status from Mexico into the United States and within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector at 311 Athey Avenue, San Ysidro, California, 92173.

1

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

**TRAINING AND EXPERIENCE**

4.      I am a Border Patrol Agent with U.S. Customs and Border Protection, United Sates Border Patrol (USBP), and have been so employed since February of 2006. I am assigned to the Imperial Beach Border Patrol (IMB) Station's Targeted Enforcement Unit (TEU) and preform the majority of my duties within the IMB Station's area of reasonability (AOR).  I attended USBP basic Border Patrol Training Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico and graduated in July of 2006. The Academy curriculum incorporated specialized training in the Immigration and Naturalization Act ("INA"), statutory authority, and criminal law, including cross training in Title 21 of the United States Code (Controlled Substance Act ("CSA") violations) and Title 19 of the United States Code (Customs law violations).

5.      During the tenure of my employment with the USBP, I have patrolled the United States/Mexico International Boundary to prevent the illegal entry of aliens and/or contraband.  I have arrested individuals in violation of immigration law and other applicable federal and state laws.  During my time on patrol duties, I was involved in preparing and submitting cases, reports and evidence for administrative and criminal proceedings regarding the violation of immigration law and CSA violations.

6.      For the past six years, I have been assigned to USBP units that operate in

2

plain-clothes and drive unmarked service vehicles =conducting anti-smuggling assignments. My duties included developing criminal cases against illicit actors and their associates within criminal organizations. I have participated in the investigation of numerous criminal smuggling entities, which required surveillance of static and mobile targets of interest. I have performed work on open investigations, developed target files, writing administrative subpoenas and warrants, and developed leads on suspects. In addition, I have analyzed cell phone tolls and other information to identify criminal associates and smuggling organizations thought various databases. The smuggling of non-citizens without legal status generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting the non-citizens without legal status are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the non-citizens without legal status at the border, at which time they receive instructions, including where to pick-up the non-citizens without legal status for transportation into the United States and where to take the non-citizens without legal status after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Non-citizens without legal status also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for human smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media,

or messaging applications when contact is lost with the driver after an apprehension has occurred.

7. Through my training and experience, I have gained working knowledge and insight into the typical workings of alien smuggling organizations. I have also gained extensive knowledge as to the normal operational habits of persons involved in alien smuggling. Through the course of my training, investigations and conversations with other law enforcement personnel, I have become familiar with the behavior and methods of operations of alien smugglers to avoid detection and apprehension by law enforcement officers. Furthermore, I am aware that it is common practice for alien smugglers to facilitate movement of non-citizens without legal status, to further their entry into the United States, using passenger vehicles, to include; personally owned and registered vehicles; rental vehicles; borrowed vehicles; stolen vehicles; or vehicles with no valid registration.

8. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to transport non-citizens without legal status from outside the United States into and throughout the United States;

   b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to transport non-citizens without legal status from outside the United States into and throughout the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the transporting of non-citizens without legal status from outside the United States into and throughout the United States;

4

d. tending to identify travel to or presence at locations such as stash houses, load houses, or delivery points involved in the transporting of non-citizens without legal status from Mexico to the United States or throughout the United States;

e. tending to identify the user of, or persons with control over or access to, the subject phone; or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

## FACTS SUPPORTING PROBABLE CAUSE

### The June 28, 2022 Event

9. On Tuesday, June 28, 2022, Special Operations Supervisor (SOS) Richard Gaus was assigned to Acting Watch Commander (AWC) duties within the Imperial Beach Border Patrol Station's (IMB) area of responsibility. He was driving an unmarked agency vehicle and wearing a full rough duty uniform. At approximately 5:25 a.m., he observed a 2007 black Cadillac Escalade, bearing California license plate 8YVJ591 (the "vehicle" or "Cadillac"), driving northbound on Seacoast towards Imperial Beach Boulevard occupied by at least two subjects. At the time, agents were actively searching for a group of suspected non-citizens that were observed being dropped off by multiple jet skis. Approximately two weeks prior, AWC Gaus observed this same vehicle in the immediate area of another jet ski drop off event. AWC Gaus began following the vehicle to further investigate.

10. AWC Gaus followed the vehicle as it drove down numerous side streets, making several turns in the Imperial Beach community before committing eastbound on Palm Avenue. Human smugglers will often make several turns onto different streets in order to detect and evade law enforcement surveillance.

11. While following the vehicle, AWC Gaus requested record checks on the vehicle through agency dispatch. Record checks revealed the vehicle was registered out of Montebello, California. Montebello is approximately 126 miles north of Imperial Beach. Human smugglers will often acquire vehicles registered from far outside the area to maintain their anonymity.

12. At approximately 5:32 a.m., AWC Gaus activated his lights and siren to initiate a vehicle stop on the Cadillac at the intersection of Palm Avenue and 3rd Street. The vehicle failed to yield and continued eastbound on Palm Avenue until it reached the intersection of Palm Avenue and Carolina Street. At that point, the vehicle began driving eastbound in the westbound lanes of Palm Avenue. Due to the inherent risk to the motoring public, at approximately 5:33 a.m., AWC Gaus self-terminated the pursuit, turning off his lights and siren and came to a stop on the side of the road at the intersection of Palm Avenue and 7th. The vehicle successfully absconded on this event.

**The August 16, 2022 Event**

13. On August 16, 2022, at approximately 12:25 a.m., the Joint Harbor Operations Center (JHOC) operator relayed to Border Patrol Agents via agency radio that they observed a personal watercraft (PWC) commonly known as a "jet ski" returning south into Mexico. Agents checked the common drop off locations of PWC and discovered two subjects hiding in the rocks near the south end of Seacoast Drive in Imperial Beach, California. Agents arrested the two subject, who happened to be a female and her juvenile child for an illegal entry at approximately 12:55 a.m.

14. As Agents were finishing up the apprehension near Seacoast Drive, at approximately 12:55 a.m., the JHOC operator relayed to Imperial Beach Station Agents via agency radio that they had observed two PWCs cross the maritime boundary line

(dividing the United States and Mexico), heading northbound. At approximately 1:00 a.m., a United States Coast Guard (USCG) small boat responded to the incursion. The USCG small boat attempted to stop the PWCs by activating its emergency equipment but the PWCs failed-to-heave and a maritime pursuit ensued. The PWCs came close to shore near Beach Street in Imperial Beach, California and dropped off two subjects near the breakers. At approximately 1:08 a.m., after dropping two subjects off, the PWCs hugged the breakers heading southbound, successfully evading the Coast Guard and returning to Mexico.

15. At approximately 1:10 a.m., Border Patrol Agent (BPA) Julian Hernandez discovered both subjects believed to have departed of the PWCs attempting to hide from Agents near Beach Street and Seacoast Drive. BPA Hernandez conducted an immigration inspection on both subjects and determined they were present in the United States illegally and were citizens of Mexico. At approximately 1:10 a.m., BPA Hernandez arrested the two subjects. These subjects were identified as Silvestre ROMAN-Figueroa and Josue BAYARDO-Vasquez. Both subjects were transported to the Imperial Beach Border Patrol Station for processing.

16. At approximately 1:40 a.m., BPA Robert Joa observed what appeared to be the same Cadillac from the June 28, 2022 event given the make and license plate of the vehicle driving near the prior PWC drop-off location on Seacoast Drive. BPA Joa requested record checks through dispatch via agency radio. When BPA Joa requested the checks, AWC Guas, communicated via agency radio that he recognized the vehicle as the same one that failed-to-yield to agents in the past, including the June 28, 2022 event. BPA Joa followed the Cadillac through several city blocks in the city of Imperial Beach, California. BPA Joa ultimately terminated surveillance due to the Cadillac using counter-surveillance and erratic driving maneuvers in residential neighborhoods.

17. Approximately 20 minutes later, at approximately 2:00 a.m., BPA Juan Gonzalez observed the Cadillac traveling eastbound on Imperial Beach Boulevard at the intersection of 13th Street in Imperial Beach, California. BPA Gonzalez was driving a marked Border Patrol transport van and began following the Cadillac. BPA Gonzalez followed the Cadillac as it merged onto northbound Interstate-5. BPA Gonzalez terminated surveillance at the Interstate 5 and State Route 94 interchange. BPA Gonzalez relayed his last observation of the Cadillac as traveling northbound on I-5.

18. At approximately 2:22 a.m., AWC Gaus telephonically and electronically notified the San Clemente Border Patrol Checkpoint Station that the Cadillac was traveling northbound on Interstate 5. AWC Gaus relayed to agents that the Cadillac previously failed-to-yield and that it was associated to an alien smuggling organization that Imperial Beach Border Patrol was actively investigating.

19. At approximately 2:50 a.m., BPA Kyle Daffern was conducting roving patrol duties on Interstate 5 in the San Clemente Border Patrol Station's area of responsibility, searching for the "Be On The Lookout" (BOLO) on the Cadillac. At this time, BPA Daffern observed the Cadillac traveling north on Interstate 5 near the Las Pulgas Avenue exit. BPA Daffern communicated his observations via agency radio and began following the Cadillac. The Cadillac was observed traveling approximately 80 miles per hour (MPH) and slowed down to approximately 60 MPH when a nearby marked Border Patrol vehicle drove near it. Agents observed the Cadillac made an unexplained lane change from lane number three to lane number two.

20. At approximately 2:50 a.m., BPA Christopher Moffitt, operating a marked Border Patrol vehicle, effected a vehicle stop of the Cadillac approximately four miles south of the San Clemente Border Patrol Station's checkpoint on Interstate 5. BPA Isidro

Gaytan assisted with the vehicle stop and approached the Cadillac alongside BPA Daffern and BPA Moffitt. BPA Gaytan identified himself to the vehicle occupants as a Border Patrol Agent. BPA Daffern approached the driver side door and BPA Moffitt approached the passenger side door.

21. BPA Moffit conducted an immigration inspection on the rear passengers, later identified as Omar VICTORIA-Castano, and Josue BAYARDO-Vasquez. VICTORIA and BAYARDO.  They each stated that they were citizens of Mexico without proper immigration documents to be in the United States legally.

22. BPA Daffern pulled the driver, Sebastian MEDINA, out of the vehicle and placed him under arrest for violation of 8 U.S.C. 1324. BPA Gaytan also arrested the front seat passenger, Jesus CARRASCO-Mendoza. Agents discovered the **Target Devices** in and around the center console of the Cadillac. All subjects, **Target Devices**, and vehicle were taken to the San Clemente Border Patrol Station for processing.

23. San Clemente Agents notified Imperial Beach Station of the arrest.  Imperial Beach Supervisory Border Patrol Agent (SBPA) Jorge Gutierrez sent BPAs Alexander Palafox, Peter Pincoski and Peter Iglesias to the San Clemente Station to assist with the interviews and ultimately transport the defendants and material witness to the Imperial Beach Station to complete the processing.

24. At approximately 4:48 a.m., at the San Clemente Station, VICTORIA provided a video recorded statement to BPA Arturo Nevares-Esquivel and BPA Calvin Weber. In summary, VICTORIA stated he was a citizen of Mexico born in Teopantlan, Puebla, Mexico, and illegally crossed into the United States via a PWC the night of August 16, 2022. VICTORIA claimed to have made smuggling arrangements to be smuggled to Los Angeles, California, for a fee of approximately $10,000 USD. VICTORIA identified

Sebastian MEDINA as the driver of the vehicle and Jesus CARRASCO-Mendoza as the passenger of the vehicle through a six-pack photographic line-up.

25. At approximately 8:03 a.m., at the Imperial Beach Station, BAYARDO provided a video recorded statement to BPA Fernando Estrada-Flores and BPA Carlos Ramolete. In summary, BAYARDO stated he was a citizen of Mexico born in Mazatlan, Sinaloa, Mexico, and illegally crossed into the United States via a PWC at approximately 12:30 a.m. this morning. BAYARDO claimed to have made smuggling arrangements to be smuggled to Los Angeles, California, for a fee of approximately $12,000 USD. BAYARDO stated that, originally, three PWCs were staged at Playas de Tijuana. Due to mechanical issues, only two PWCs were utilized to smuggle the group of men.

26. BAYARDO was shown a photographic lineup consisting of six photographs, to which he identified two individuals in the lineup. As to the first individual, BAYARDO stated that the subject was at Playas de Tijuana and he observed this individual pushing the PWC in the water. This subject was identified by Agents as Omar VICTORIA-Castano. As to the second individual, BAYARDO stated that this individual was fueling the PWCs at Playas de Tijuana. This individual iwas identified by Agents as Yimy AVENDANO-Cruz, a Columbian national.

27. Per records, AVENDANO already was in Border Patrol custody since August 15, 2022. It is unlikely that AVENDANO is the actual individual that BAYARDO saw in Playas de Tijuana around midnight/early morning of August 16, 2022. It is possible that the individual BAYARDO observed looks like AVENDANO.

28. During his interview, BAYARDO also claimed that he thought he would have drowned if the PWC flipped and that he is not a strong swimmer in open water. BAYARDO

1 stated that he saw a "Border Patrol" boat which began chasing them before they made
2 landfall. BAYARDO stated that he thought he saw a flare shot from the Border Patrol boat.

3     29. At approximately 8:44 a.m., at the San Clemente Station, BPA Alexander
4 Palafox and BPA Peter Pincoski advised CARRASCO of his Miranda rights. CARRASCO
5 understood his rights and elected to answer questions without an attorney present.
6 CARRASCO stated he is a citizen of Mexico and was born in Mazatlan, Sinaloa, Mexico
7 and entered legally and was admitted on a visitor's visa. CARRASCO explained that he
8 was living in Las Vegas, Nevada and moved to Anaheim, California where he has been
9 living with his sister for about a year. CARRASCO claimed he met MEDINA about five
10 months ago and became his friend. CARRASCO and MEDINA were drinking together the
11 previous night and MEDINA invited CARRASCO to go pick up a friend in San Diego.
12 CARRASCO agreed to go with MEDINA to San Diego. CARRASCO claimed that he was
13 so drunk he fell asleep in the car. Once they were near the beach, MEDINA got out of the
14 car, and came back with another individual. CARRASCO fell asleep again once they got
15 back on the freeway. CARRASCO admitted he consumed some cocaine the prior night
16 when he was drinking with MEDINA. CARRASCO said he woke up when agents pulled
17 them over. CARRASCO claimed he had no knowledge of the alien smuggling event.

18     30. Based upon my experience and training, consultation with other law
19 enforcement officers experienced in human smuggling investigations, and all the facts and
20 opinions set forth in this affidavit, I believe that telephone numbers, contact names,
21 electronic mail (email) addresses, appointment dates, messages, pictures, and other digital
22 information are stored in the memory of the **Target Devices**. In light of the above facts and
23 my experience and training, there is probable cause to believe that MEDINA and other
24 individuals in the Cadillac were using the **Target Devices** to communicate with others to

further the conspiracy to transport certain aliens into and throughout the United States. Based on my training and experience, it is also not unusual for individuals, such as the MEDINA, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on April 27, 2022 (approximately one month before the June 28, 2022, event), through August 16, 2022 (the date of MEDINA's most recent arrest).

## METHODOLOGY

31. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic

data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

32. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

33. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## CONCLUSION

Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of crimes of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I) (conspiracy to transport certain aliens). Accordingly, I request that the Court issue a warrant authorizing law enforcement to search

the items described in Attachments A-1 through A-3, and seize the items listed in Attachment B using the above described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Alexander Djokich
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 13th day of October 2022.

_____
Hon. Barbara L. Major
United States Magistrate Judge

14

ATTACHMENT A-2

PROPERTY TO BE SEARCHED:

Android Tablet (black), IMEI: 016095009370331Seized as FP&F No. 2022565800003201 Item 002 ("Target Device 2")

Target Device 2 is currently being stored at the U.S. Border Patrol's Asset Forfeiture Office located at 311 Athey Ave. San Ysidro, California 92173.

ATTACHMENT B

Authorization to search the Target Devices described in Attachments A-1 through A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below. The seizure and search of the Target Devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Devices will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 27, 2022 to August 16, 2022._

a. tending to indicate efforts to transport non-citizens without legal status from Mexico into the United States and within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the transportation of non-citizens without legal status from Mexico into the United States and within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the transportation of non-citizens without legal status from Mexico into the United States and within the United States

d. tending to identify travel to or presence at locations involved in the the transportation of non-citizens without legal status from Mexico into the United States and within the United States from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and (v)(I).